Filed 7/1/26  P. v. Escalante CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087609 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2100422) |
| VINCENT RAYMOND ESCALANTE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jason Armand, Judge.  Affirmed.

Robert Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel Rogers and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

In the early hours of a January morning, 18-year-old Vincent Raymond Escalante and minor J.G. robbed Travis Van Skyock while he sat in his car in a parking lot. During the encounter, J.G. shot Van Skyock in the back after the victim got out of his car. Escalante fled the scene in Van Skyock's SUV; J.G. left in a different vehicle. Van Skyock was left alone on the pavement and later died from his injuries.

J.G. pleaded guilty to murder in juvenile court. A jury convicted Escalante of first degree murder (Pen. Code § 187,[1] subd. (a)) under a felony murder theory. On appeal, Escalante argues: (1) insufficient evidence supports a finding that he was a major participant in the robbery who acted with reckless indifference to life, as required to sustain his conviction for the first degree robbery-murder special circumstance as a nonshooter; (2) the court erred in allowing the investigator to testify concerning the credibility of certain witnesses; (3) the court erred in admitting a photograph of the victim while alive; and (4) the prosecutor committed misconduct by improperly defining the term "abiding conviction" when explaining the burden of proof. Finding no prejudicial error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 1:30 a.m. on January 13, 2021, Escalante arrived at a parking lot in a car driven by Alicia Lopez. They met up with Thanya Luevano and J.G. All four were there to do drugs and pass the time. Escalante was looking to sell a bottle of Xanax.

Van Skyock arrived later in his SUV. Between 3:00 and 4:00 a.m., Escalante and J.G. got in and out of Van Skyock's SUV, presumably so

---

[1] All further undesignated statutory references are to the Penal Code.

2

Escalante could sell Van Skyock drugs. At one point, Lopez saw J.G with a gun and overheard J.G. tell Luevano that Escalante was going to rob Van Skyock. After this, J.G. rejoined Escalante in Van Skyock's SUV.

About 10 minutes later, J.G. and Escalante walked around to the driver's side of the SUV and J.G. shot Van Skyock in his torso. Escalante immediately drove Van Skyock's SUV out of the parking lot, leaving Van Skyock on the pavement. J.G. got into Luevano's car and both Luevano and Lopez drove out of the parking lot, as Van Skyock called out for help. Surveillance footage captured much of the activity.

When the police arrived 30 minutes later, Van Skyock was conscious but unable to say much. He told them "Stomper"— later determined to be a nickname for J.G.—shot him. Officers found a knife belonging to Van Skyock near the crime scene.

Lopez and Escalante met up at a dirt field, where Escalante smashed a cell phone and wiped down fingerprints on the SUV before abandoning it. They then met up with J.G. and Luevano outside Lopez's apartment. According to Lopez, J.G. said Escalante "chickened out," handed him the gun and told him "you do it," so he shot the victim. Escalante told Lopez he had the victim's wallet and claimed it only had one dollar. Escalante went to the mountains to burn the wallet.

After a traffic stop on an unrelated matter, Lopez informed the police she had information about a shooting. Investigator Gary Bowen interviewed Lopez. Lopez initially claimed she arrived alone at the parking lot, and Escalante shot Van Skyock, but she changed her story when investigator Bowen showed her photographs from the surveillance video.

During an interview with investigator Bowen, Escalante admitted he was present during the shooting and identified himself in a still photograph

3

from the parking lot surveillance video. He denied attempting to murder Van Skyock, but admitted to carjacking him.[2] He claimed he and J.G. were both armed with a gun that night, but he got rid of his gun. Investigators later searched Escalante's phone and found a video he made the day after the shooting in which he sang, "Homie, chillin' up here in Lake Arrowhead. … Someone's son died but nobody cried cuz they don't give a fuck… . [T]hey didn't know what to do but I still did what I did. … [I] do as I please."

A jury convicted Escalante of first degree murder (§ 187, subd. (a)) and found true the special circumstances of murder during the commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a carjacking (§ 190.2, subd. (a)(17)(L)). The jury also found true the allegation that Escalante was a principal in the murder, and another principal was armed with a firearm (§ 12022, subd. (a)(1)). The trial court struck the punishment for the armed principal allegation and sentenced Escalante to life in prison without parole for first degree murder with special circumstances.

## DISCUSSION

### A. *Sufficient evidence supports the jury's verdict that Escalante was a major participant and acted with reckless indifference to human life.*

Escalante contends there was insufficient evidence that he was a major participant in the underlying robbery and carjacking and that he acted with reckless indifference to human life so as to sustain his conviction for first degree special circumstance murder as a nonshooter.

When considering a challenge to the sufficiency of the evidence to support a conviction, " 'we review the record "in the light most favorable to

---

2    At the time of this interview, the victim was still alive, so investigator Bowen identified the crime as "attempt[ed] murder."

the judgment" to determine whether it contains substantial evidence—that is, "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1028–1029.) The same standard applies to reviewing the sufficiency of the evidence to sustain a true finding on a special circumstance allegation. (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Under the felony murder rule, someone who participates in an enumerated felony (including robbery and carjacking) in which a death occurs may be convicted of first degree murder if they were a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (§ 189 (e)(1)–(3).) Section 190.2, subdivision (d), in turn, provides that, "[i]n the case of first degree felony murder, 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant' aids or abets the crime may be convicted of special circumstance murder." (*People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*), quoting § 190.2, subd. (d).) This statute has "both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks*, at p. 798, fn. omitted.) The requirements for felony murder liability under section 189, subdivision (e)(3), are the same as special circumstance liability under section 190.2, subdivision (d). (*People v. Montanez* (2023) 91 Cal.App.5th 245, 265.)

To assist in determining whether a defendant was a major participant, *Banks* identified a nonexclusive list of factors that includes: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal

5

weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death?[]  What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) No one factor is necessary or alone sufficient.  (*Ibid*.)

As *Banks* did with respect to the major participant element, *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) provides a nonexclusive list of factors bearing on whether the defendant acted with reckless indifference.  Factors to consider include:  (1) duration of the crime (2) knowledge of weapons used in the crime, and their actual use and number; (3) presence at the crime and opportunities to stop the killing or aid the victim; (4) knowledge of the actual killer's propensity to kill; and (5) efforts to minimize the possibility of violence during the crime.  (*Id.*, at pp. 618–622.)

The requirements for being a major participant and exhibiting reckless indifference to human life " 'significantly overlap … , for the greater the defendant's participation in the felony murder, the more likely [the defendant] acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at pp. 614–615.)

Substantial evidence supports the finding that Escalante was a major participant in the robbery and carjacking.[3] The evidence demonstrates Escalante was the principal figure who planned the robbery and carjacking. Minutes before the shooting, J.G. announced that Escalante was going to rob the victim. Escalante's swift flight in the victim's SUV, rather than fleeing in one of his friend's cars, supports an inference that he planned the carjacking. We must accept reasonable inferences drawn from the circumstantial evidence. (See *People v. Maury* (2003) 30 Cal.4th 342, 396.)

Not only did Escalante plan the underlying robbery and carjacking, but there was evidence that he chose a firearm as the means of forcing the victim to turn over his property and then increased the risk of violence by relinquishing control of the weapon and giving it to J.G. After J.G. shot the victim, Escalante expressed no surprise or concern. Rather, he left him lying on the pavement without rendering aid and drove off with his SUV. Weighing the factors, we conclude a reasonable trier of fact could find beyond a reasonable doubt that Escalante had significant involvement in the underlying criminal activities known to carry a grave risk of death, and was thus a "major participant." (*Banks*, *supra*, 61 Cal.4th at p. 803.)

---

[3] The Attorney General contends that Escalante forfeited his challenge to the jury's actus reus/major participant findings because he confined his argument to the mens rea issue of reckless disregard. We nonetheless address the sufficiency of the evidence as to both elements because the requirements for being a major participant and exhibiting a reckless indifference to human life " 'significantly overlap.' " (*Clark*, *supra*, 63 Cal.4th at pp. 614–615.) Critically, factors demonstrating Escalante's role as a major participant are also "relevant to the analysis of whether he acted with reckless indifference." (*In re Loza* (2017) 10 Cal.App.5th 38, 52.)

Even if he was a major participant in the carjacking and robbery, Escalante argues the *Clark* factors do not support a finding that he acted with reckless disregard for human life. We disagree.

First, Escalante argues the "duration of the violent contact"—a matter of seconds—weighs against a finding of reckless indifference. The relevant duration, however, is not the few seconds it took to rob, shoot and carjack the victim, but the entire encounter leading up to the crimes. (*Clark*, *supra*, 63 Cal.4th at p. 620 [considering "the duration of the *interaction* between victims and perpetrators" (italics added)].) Escalante was with the victim in his SUV off and on for an hour, creating a " 'greater window of opportunity for violence.' " (*Ibid.*)

Second, he argues that he did not use a gun during the robbery, and there is no evidence that he knew J.G. would shoot the victim or that J.G. had a propensity for violence. This argument, however, sidesteps the evidence that Escalante brought a loaded gun to the crime scene, passed it to J.G., and encouraged J.G. to use it. "A defendant's *use* of a firearm, even if the defendant does not kill the victim … can be significant to the analysis of reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618.)

Third, relying on *In re Scoggins* (2020) 9 Cal.5th 667, 683, Escalante contends he minimized the risk of violence because the robbery was planned to occur in an open area with witnesses present. We find *Scoggins* readily distinguishable. In contrast to this case, the underlying crime in *Scoggins* involved an *unarmed* beating and robbery. Indeed, the Supreme Court recognized that " 'the need to minimize the risk of violence when planning an unarmed beating is less pressing than the need to minimize the risk of violence when planning an armed robbery.' " (*Id.* at p. 683.) Similarly, the unarmed assault in *Scoggins* occurred in "a public parking lot *during*

*the daytime*, when the possible presence of witnesses might reasonably be thought to keep his accomplices within the bounds of the plan." (*Ibid.*, italics added.)  Here, the robbery was planned for the middle of the night when the only likely witnesses were Escalante's associates.

Finally, Escalante was present during all phases of the robbery, shooting, and carjacking.  (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148 ["Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry"].)  Despite his proximity to the victim, Escalante argues that J.G.'s unexpected and sudden use of lethal force deprived him of the opportunity to prevent the violence or aid the victim.  This argument ignores other record evidence including testimony that Escalante facilitated the robbery by providing the gun, instructed J.G. to use it, and left the victim without rendering aid.

We are unpersuaded by Escalante's argument that he was necessarily less culpable because he was 18 years old at the time of the shooting.  The court properly instructed the jurors to consider his age.  Nevertheless, "every 18 year old understands bullet wounds require attention.  The fact of youth cannot overwhelm all other factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.)  Additionally, Escalante's postcrime conduct, including destroying evidence and directing Lopez to assist with wiping down the stolen car, showed a level of criminal maturity and awareness of his culpability.  Finally, Escalante posted a video of himself a day after the shooting singing "[s]omeone's son died … but I still did what I did," which the jury could reasonably interpret as bragging about his involvement in the victim's death. Of course, anticipating a future risk and bragging about something that has already happened are two different things.  Although we acknowledge that youthful offenders, in particular, frequently say things

9

without thinking, Escalante's willingness to take credit for the victim's death fully supports the finding of reckless indifference.

Viewing the record in the light most favorable to the jury's verdict as we must, we conclude sufficient evidence supports a finding that Escalante was a major participant in the robbery/carjacking and acted in reckless disregard of human life.

**B.** ***The trial court did not prejudicially err by admitting the investigator's testimony about the credibility of Alicia Lopez and Vincent Escalante.***

Escalante argues the trial court erred in admitting investigator Bowen's testimony that in the interview he conducted with Lopez, she initially lied but later became truthful. Escalante also contends the court erred by admitting Bowen's testimony that Escalante lied to him. We review a trial court's ruling to admit evidence for abuse of discretion. (*People v. Fayed* (2020) 9 Cal.5th 147, 189.)[4]

---

[4] Escalante also briefly raises a federal due process argument. The People assert that because Escalante did not object to this testimony on federal constitutional grounds, he forfeited the argument. (*People v. Anderson* (1990) 52 Cal.3d 453, 478.) We agree. Notwithstanding any forfeiture, however, we reject Escalante's due process argument because, as explained below, any error is harmless. Escalante further argues that, to the extent we find he has forfeited his due process argument or any other portion of his claim regarding the introduction of Bowen's testimony, it is the result of ineffective assistance of counsel for failing to lodge an appropriate objection to the testimony. Because we find any error in the admission of Bowen's testimony harmless beyond a reasonable doubt, Escalante cannot show he was prejudiced by his counsel's failure to object to the testimony on any ground. (*Strickland v. Washington* (1984) 466 U.S. 668, 694, 700 [defendant must show a reasonable probability that, but for counsel's unprofessional errors the outcome would have been different and a failure to show sufficient prejudice defeats an ineffectiveness claim].)

1.      *Additional Facts*

In reviewing the surveillance video, investigator Bowen created a timeline that included events and participants from the crime scene. Bowen then interviewed Lopez and Escalante. The jury heard audio clips of the interviews. Initially, Lopez told Bowen she arrived alone in the parking lot and Escalante was the shooter. Once Bowen showed her photos from the surveillance video, Lopez changed her story. Bowen testified that he believed Lopez lied at the beginning of the interview because he had "some knowledge" and "some bits of evidence," and Lopez's story did not "make sense." As the interview progressed, Lopez's statements corroborated the evidence Bowen had in his possession, "like the video." "[F]or the most part," Bowen believed he got "truthful information" from Lopez. Bowen used his timeline to help determine which information provided by Lopez was corroborated.

Bowen later interviewed Escalante. Escalante provided information that was both consistent and inconsistent with the evidence Bowen already had, becoming "more consistent" as the interview progressed. Some of Escalante's statements corroborated Lopez's statements, yet other statements were inconsistent. In particular, both Lopez and Escalante admitted: (1) a shooting occurred in the parking lot; (2) they both arrived in Lopez's car and J.G. arrived in Luevano's car; (3) Escalante went to sell the victim some pills; (4) Escalante drove off in the victim's car; and (5) Escalante went to the mountains after the shooting.

11

2.    *Analysis*

"[G]enerally[,] a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221; see also *People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*) ["Lay opinion about the veracity of particular statements by another is inadmissible on that issue"].) For instance, a testifying officer generally cannot testify about the credibility of the defendant or a witness. (*People v. Smith* (1989) 214 Cal.App.3d 904, 915.)

The record does not establish that Bowen was an expert on judging credibility, or on the truthfulness of witnesses he interviewed in the investigation. Thus, he was not permitted to express an opinion about the veracity of the witnesses. (*Melton*, *supra*, 44 Cal.3d at p. 744.) Here, however, Bowen did not testify as to his opinion on Escalante's veracity. Instead, he described the similarities between Escalante's and Lopez's statements and identified events that they both corroborated. This testimony was not inadmissible merely because it described the "twists and turns in a long interrogation" and mirrored the interviews heard by the jury, including Lopez's own admissions about lying and changing her account. (*People v. Stitely* (2005) 35 Cal.4th 514, 546.) But to the extent Bowen testified that Lopez initially lied but later became more truthful, we conclude this was inadmissible opinion evidence. Insofar as the trial court admitted Bowen's testimony as an assessment of Lopez's credibility, that ruling was erroneous. (See *Melton*, at p. 745.) We next turn to whether such error was harmless.

Under federal standards, an error is prejudicial and requires reversal unless we can conclude beyond a reasonable doubt that it was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.) An error is harmless beyond

a reasonable doubt if there is no " 'reasonable possibility that the [error] complained of might have contributed to the conviction.' " (*Ibid.*, quoting *Fahy v. Connecticut* (1963) 375 U.S. 85, 86–87.) Reversal is also required under the California harmless error standard if there is a "reasonably probable" chance of a more favorable result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

We find the erroneous admission of Bowen's opinion testimony about Lopez was harmless under either standard. First, ample evidence existed from which a jury could reach its own conclusions about Lopez's veracity. The jurors reviewed the same surveillance video and heard Bowen's recorded interviews with Lopez and Escalante that formed the basis for his opinions. Thus, the jury could determine for itself which of Lopez's statements were inconsistent or uncorroborated by Escalante's statements. The jury also heard extensive testimony from Lopez, including her admission that she "lied a lot" during her interview and obvious inconsistencies about whether J.G. retrieved a gun from Luevano's car. Defense counsel argued that Lopez's inconsistencies and prior criminality made her not credible and highlighted these issues throughout cross-examination, enabling the jury to evaluate Lopez's credibility independently.

Second, Bowen did not vouch for Lopez's credibility. He testified he obtained truthful information from her "for the most part" and acknowledged that some of her statements were consistent with the evidence while others were not. This qualified assessment does not constitute a blanket endorsement of her credibility.

Third, the trial court repeatedly instructed the jury that it alone was to judge a witness's credibility and, given that Lopez was a possible accomplice, it should also consider whether her testimony was corroborated. We presume

13

the jury followed those instructions.  (*People v. Sedano* (2023) 88 Cal.App.5th 474, 485 (*Sedano*).)

Finally, the evidence against Escalante was significant, including the surveillance video capturing his interactions with the victim and his flight from the scene in the victim's SUV.  Considering the record as a whole, we conclude that any error in admitting the opinion evidence was harmless under either a state or federal standard.

Escalante suggests that Bowen improperly testified he relied on "other evidence," including extrajudicial testimony from Luevano, to support his opinions about Lopez's and Escalante's credibility.  (Cf. *People v. Linton* (2013) 56 Cal.4th 1146, 1207 [" '[I]t is [prosecutorial] misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness" ' "]).  But having reviewed the testimony, we are convinced the jury would not have understood Bowen to be referring to secret inadmissible evidence that corroborated his opinion.  Rather, he sufficiently identified the evidence upon which he relied at various points in his testimony.  He repeatedly referred to the surveillance video and body camera footage, which he used to create a timeline of the events and to identify the participants.  By comparing Lopez's and Escalante's statements, he identified which events were corroborated.  While he agreed Luevano's interview was helpful, the court sustained objections to additional questions on that topic, and neither Bowen nor the prosecutor insinuated they had other evidence from Luevano.  When taken in context, his testimony did not imply he relied on extrajudicial evidence.

**C.** ***The trial court did not prejudicially err in admitting a photograph of the victim while he was alive.***

Escalante contends the court erred when it admitted a photograph taken of the victim while he was still alive. He argues the photograph was not relevant, and its probative value was outweighed by the prejudicially sympathetic effect it had on the jury.

1. *Additional Facts*

The prosecution moved in limine to introduce a photograph of the victim, which depicted him from the chest up with a disposable face mask pulled down under his chin. The prosecution sought to introduce the photograph to show the victim was once a "healthy adult male" and not just a "dead piece of meat lying on the ground," and to establish the identification of the deceased. The defense argued no issue existed as to whether the victim was alive prior to the shooting. The court tentatively ruled it would admit the photograph of the victim if the prosecutor did not introduce the body camera video of the victim's dying declaration from the scene of the crime. At trial, the defense, not the prosecution, introduced the body camera video of the victim, and the court admitted the life photo. Bowen identified the victim in the photograph, and the prosecutor displayed the photograph during summation.

2. *Applicable Law*

The admission of photographs of the victim lies within the discretion of the trial court; such discretion will not be disturbed unless the probative value of the photograph is clearly outweighed by their prejudicial effect. (*Watson, supra,* 46 Cal.2d at p. 837) " ' " 'To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs

15

were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 43.)

The Supreme Court has "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items. [Citations.] Otherwise, there is a risk that the photograph will merely generate sympathy for the victims." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 (*DeSantis*).) "To comply with this stricture, the trial judge should carefully consider the actual relevance of photos of murder victims while alive, and, if such evidence is indeed admissible, state the grounds on the record, thereafter exercising vigilance to restrain counsel from the use of the photos for a purpose beyond that for which they were admitted." (*People v. Winn* (2020) 44 Cal.App.5th 859, 866–867.)

3.    *Analysis*

We conclude the court did not abuse its discretion in admitting the photograph. At a hearing on the issue, the court questioned the probative value of the photograph, given the existence of the body camera video showing the victim alive being questioned by first responders. The prosecutor argued the body camera video depicted the victim as a "dying piece of meat." While the court's conclusion that the "probative value is what it is" is ambiguous, the record shows the court found the photo had some relevance to show the victim was alive.

Escalante argues that the jury saw other videos of the victim, thus eliminating the need for a photograph. He points to *People v. Bonin* (1989) 47 Cal.3d 808, 848–849 and *People v. Poggi* (1988) 45 Cal.3d 306, 323, which found error in the admission of photographs of the victim when the defendant

16

offered to stipulate to the facts the prosecution intended to establish because such an offer renders the photographs irrelevant and inadmissible. We find these cases distinguishable. Unlike *Bonin* and *Poggi*, defense counsel in this case did not offer to stipulate to this point; thus, at least technically, the issue remained a matter in dispute.

Even if the probative value was minimal in light of other evidence that the victim was alive, we find that admission of the photograph had no prejudicial effect. (See *Watson*, *supra*, 46 Cal.2d at pp. 835, 837.) Here, the court observed the photograph was "innocuous." It concluded that any sympathy generated from it would be insignificant compared to the body camera footage of the victim lying in agony on the cold surface of the parking lot, and the 911 call where he was going in and out of consciousness "fearful of his impending demise." Also, the defense introduced a "booking" photograph of the victim in his opening statement; in contrast, the prosecution's photograph depicted the victim in a neutral setting that was not likely to evoke an "emotional bias." (*People v. Virgil* (2011) 51 Cal.4th. 1210, 1248.) On this record, Escalante has not shown how the admission of this single photograph prejudiced him. (See *DeSantis*, *supra*, 2 Cal.4th at p. 1231.)

Finally, Escalante's claim that admission of the photograph violated the federal constitution is forfeited because he lodged no objections before the court on these grounds. (Evid. Code, § 353; see *People v. Boyette* (2002) 29 Cal.4th 381, 424 [holding federal constitutional claims to evidence forfeited where defendant never asserted those specific grounds in trial court].)

**D.**   *Even if the prosecutor erred in attempting to explain the concept of an "abiding conviction," the error was not prejudicial.*

Escalante argues the prosecutor committed misconduct during closing argument by improperly defining the burden of proof and appealing to the jury's sympathy for the victim. He claims this error deprived him of due process under the state and federal constitutions.[5] When the misconduct claim is raised in the first instance in the trial court, we review the ruling for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793.

1.   *Additional Facts*

In her closing argument, the prosecutor explained the term "abiding conviction"—as referenced in the jury instructions defining proof beyond a reasonable doubt—as "something that sticks with you over time." She provided an example that, the day after reaching a guilty verdict "you think to yourself, I gave justice to this poor victim and I'm glad I did that. That's an abiding conviction." As another example, the prosecutor described jurors, two weeks after the trial, feeling "proud" because the victim "didn't deserve" to be murdered, and that's "why you convicted him." Defense counsel objected on the ground that the prosecutor was misstating the burden of proof. The prosecutor next provided an example of an abiding conviction as one where, two years from now "you say, I'm proud I gave justice to that victim." Outside the presence of the jury, defense counsel later objected to the prosecutor's display of a "sympathetic" photograph of the victim during the prosecutor's closing argument.

2.   *Applicable Law*

_____

[5]   Escalante also claimed a due process violation of the Sixth Amendment but did not present argument in support of that claim. Thus, the argument is forfeited. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

18

A prosecutor's misconduct violates the federal constitution and requires reversal when it infects the trial with such unfairness as to deny due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009 (*Tully*).) " ' "[T]he misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " ' " (*Ibid*.) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law … and particularly to attempt to absolve the prosecution from its … obligation to overcome reasonable doubt on all elements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)

Under state law, even if a prosecutor's misconduct does not render a criminal trial fundamentally unfair, it is error if the conduct involves the use of deceptive or reprehensible methods in attempting to persuade the trier of fact. (*Tully*, *supra*, 54 Cal.4th at pp. 1009–1010.) Accordingly, we review such claims of prosecutorial misconduct for prejudice. (*See People v. Mendoza* (2007) 42 Cal.4th 686, 703.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

In evaluating a claim of prosecutorial misconduct, we examine the questioned conduct in the context of the whole argument and the instructions to the jury given by the trial court (*People v. Lucas* (1995) 12 Cal.4th 415, 475) and presume that " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Morales* (2001) 25 Cal.4th 34, 47.)

19

3. *Analysis*

In general, a prosecutor cannot redefine "reasonable doubt" or "an abiding conviction" in such a way to lessen the People's burden. (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36.) Similarly, it is error to invite the jury to evaluate the strength of the evidence through the eyes of the victim or based on sympathy for what the victim suffered. (See *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 919.) By focusing on providing "justice" to the "victim" rather than on the certainty of the jury's factual findings, the prosecutor may have crossed the line between permissible advocacy and impermissible reformulation of the governing legal standard.

But even if we assume the prosecutor erred in her closing argument by mischaracterizing the nature of an "abiding conviction," Escalante has not demonstrated prejudice. The prosecutor's first comment, referring to "abiding conviction" as "something that sticks with you over time," was unobjectionable. When defense counsel objected to the additional explanations that were offered, the court reminded the jury to follow the instructions on the law as provided by the court. Those instructions correctly explained that an "abiding conviction" "means a lasting firm belief." The court further instructed the jury that if an attorney's comments on the law conflicted with the court's instructions, the jury must follow the court's instructions. We presume the jury followed these instructions. (*Sedano, supra,* 88 Cal.App.5th at p. 485.)

Escalante also did not establish that the prosecutor's comments in tandem with the use of the victim's photograph was prejudicial. As discussed, the innocuous photograph was unlikely to generate any appreciable sympathy from the jury greater than that of the body camera video footage of the victim suffering from a gunshot wound "fearful of his

20

impending demise." And Escalante does not challenge the admission of that video on appeal.

We therefore conclude that Escalante did not establish any prejudicial error, let alone a fundamentally unfair trial that denied him his due process rights.

### E.    *Cumulative Error*

Although we have identified or assumed two instances of nonprejudicial error, even taken cumulatively we do not believe they affected the jury's verdict.  (See *People v. Martinez* (2003) 31 Cal.4th 673, 704.)

### DISPOSITION

The judgment is affirmed.

DATO, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.